**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

UNITED STATES OF AMERICA

v.

JOHN EDWARD CARTER

CRIMINAL CASE NO.
1:25-cr-00366-TRJ-RGV

**MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER**

Defendant John Edward Carter ("Carter") is charged in a one-count indictment with knowingly possessing at least one computer storage device containing child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2). [Doc. 1].[1]  Carter has moved to suppress statements he made to law enforcement agents during an interview at his residence upon the execution of a search warrant, [Doc. 17], and following an evidentiary hearing on March 20, 2026,[2] the parties filed post-hearing briefs, [Docs. 29 & 30].  For the reasons that follow, it is

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[2] See [Doc. 26] for the transcript of the evidentiary hearing.  Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)."  In addition, the government submitted exhibits, which will be referred to as "(Gov. Ex. __)."

**RECOMMENDED** that Carter's motion to suppress statements, [Doc. 17], be **DENIED**.

## I.   STATEMENT OF FACTS

In October 2021, Special Agent Josh Norris ("Agent Norris") of the Federal Bureau of Investigation ("FBI") began an investigation of an unknown subject who was using the internet to download images and videos of child sex abuse material via a peer-to-peer application entitled Freenet.   (Tr. at 4-6).   The investigation revealed that the subject was using the internet at an address associated with Carter's residence, and Agent Norris obtained a search warrant for the residence.   (Tr. at 6-8).   On January 24, 2022, Agent Norris and approximately ten other law enforcement agents arrived at Carter's residence around 1:00 p.m. to execute the search warrant.   (Tr. at 9, 20-22).   At the beginning of the search, the FBI agents were accompanied by deputies from the Cobb County Sheriff's Office who were familiar with Carter based on his criminal history and his reporting obligations as a registered sex offender, but no Cobb County Sheriff's Office deputies entered the residence or participated in the search.   (Tr. at 9-10, 14).

Agent Norris and a Cobb County Sheriff's deputy approached the front door, and the deputy rang the doorbell.   (Tr. at 10; Gov. Ex. 1 at 00:40-00:50).   Carter's wife opened the door, and the deputy asked if Carter was home and

requested that she call him to come to the door, which she did.   (Tr. at 10; Gov. Ex. 1 at 01:20-01:35).   Agent Norris then asked her to step outside and stand with him while waiting for Carter to come to the door, (Tr. at 11; Gov. Ex. 1 at 01:38-01:40), and when Carter appeared at the doorway, the deputy asked Carter to step outside as well, and he complied, (Tr. at 11; Gov. Ex. 1 at 02:00-02:09).   Agent Norris identified himself and told the Carters that agents were there to execute a federal search warrant, and he asked Carter and his wife to wait outside while other agents conducted a safety sweep of the residence.   (Gov. Ex. 1 at 02:10-02:22).

Agent Norris and the deputy walked with Carter and his wife through the front yard to a patrol car parked in front of the residence, where they stood beside the patrol car while other FBI agents dressed in raid gear and carrying weapons entered the residence to conduct a preliminary safety sweep.   (Tr. at 11; Gov. Ex. 1 at 02:42-03:15).   Agent Norris frisked Carter for weapons when they reached the patrol car.   (Tr. at 11; Gov. Ex. 1 at 03:20-03:38).   While Carter waited with his wife in the front yard as FBI agents cleared the residence, Agent Norris explained that they were there to execute a search warrant, described how the search would be conducted, answered some preliminary questions, briefly discussed Carter's criminal history following an inquiry by the deputy about firearms in the residence, made small talk about the weather and the neighborhood, offered to get them

something to drink once back inside, inquired about Carter's medical needs, and indicated that the FBI would not publicize the investigation.    (Tr. at 16-17, 22-24; Gov. Ex. 1 at 03:42-14:30).

After approximately twenty minutes, the residence was cleared, and Agent Norris and the deputy escorted Carter and his wife to the front door, and Agent Norris led them inside to the living room, where they sat while the search was being conducted.    (Tr. at 24; Gov. Ex. 1 at 15:55-17:20).    Carter and his wife subsequently were interviewed in separate rooms inside the residence.    (Tr. at 25).    Carter was interviewed in his bedroom, where he sat in a chair facing the bedroom door, and Agent Norris and another FBI agent sat in front of him.    (Tr. at 12, 26-27).    Within the first few minutes of the interview, Agent Norris informed Carter that he was not under arrest, stating, "You're not under arrest right now; nothing is going on here; we're going to get out of here and leave this; I mean you're not in handcuffs; nothing is pressuring you if you decide you want to stop talking about it, then you just tell me."    (Gov. Ex. 2 at 02:50-03:02).    Carter did not appear to be under the influence of drugs or alcohol, nor did he seem to be incoherent at any time during the interview.    (Tr. at 17).    The interview was conducted in a conversational tone, and at no point did Agent Norris or the other agent raise their voice, yell, threaten, or touch Carter or point their firearms at him.    (Tr. at 12, 17).    Carter never asked for an attorney or to stop the interview.

(Tr. at 19).   The interview lasted about one hour and concluded cordially with the agents explaining that they would complete the search and provide Carter a copy of the search warrant and an inventory of items seized, and Agent Norris then asked Carter if he had any questions, but Carter said he did not.   (Tr. at 17, 19).   Agent Norris informed Carter that charges would be forthcoming after the investigation was completed, but he was not arrested that day.   (Tr. at 10-11, 29-30).

## II.   DISCUSSION

Carter moves to suppress statements he made during the interview at his residence upon the execution of the search warrant on the grounds that the statements were obtained in violation of Miranda [3] and were not made voluntarily.   [Doc. 17 at 2; Doc. 29 at 5-11].   The government responds that Carter's statements are admissible because Miranda warnings were not required, since he was not in custody, and points out that Carter did not argue that his statements were involuntary in his post-hearing brief.[4]   [Doc. 30 at 5-10].   Carter has not filed a reply.

---

[3] See Miranda v. Arizona, 384 U.S. 436 (1966).

[4] Carter challenged the voluntariness of his statements in his motion to suppress, [Doc. 17 at 2], but the government correctly contends that he did not address the

**A.**   *Miranda Violation*

The Supreme Court's ruling in <u>Miranda</u> requires law enforcement officers to apprise a defendant in custody of his Fifth Amendment rights before engaging in interrogation.   <u>See</u> <u>Garcia v. Singletary</u>, 13 F.3d 1487, 1489 (11th Cir. 1994). Interrogation for <u>Miranda</u> purposes "means 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'"   <u>United States v. Gomez</u>, 927 F.2d 1530, 1538 (11th Cir. 1991) (quoting <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980)).   "Statements made in violation of *Miranda* are not admissible at trial."   <u>United States v. Barry</u>, 479 F. App'x 297, 299 (11th Cir. 2012) (per curiam) (unpublished) (citation omitted).

Agent Norris' questioning of Carter on January 24, 2022, clearly constituted interrogation, but the parties dispute whether Carter was in custody for <u>Miranda</u> purposes at the time of the interview.   A defendant is in custody under <u>Miranda</u> when there has been a "'formal arrest or restraint on freedom of movement of the

---

voluntariness issue in his post-hearing brief, <u>see</u> [Doc. 29], and therefore, he may be deemed to have abandoned this argument, <u>United States v. Rosso</u>, Civil Action File No. 3:14-CR-00014-TCB, 2015 WL 7115860, at *28 n.26 (N.D. Ga. Nov. 12, 2015) (citations omitted).   Nevertheless, the Court will discuss the voluntariness of Carter's statement in this Report, Recommendation, and Order.

degree associated with a formal arrest.'"[5]    United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006) (citation omitted) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)).    However, "[a]n interviewee's 'status as a suspect, and the coercive environment that exists in virtually every interview by a police officer of a crime suspect,' does not automatically create a custodial situation."    United States v. Matcovich, 522 F. App'x 850, 851 (11th Cir. 2013) (per curiam) (unpublished) (quoting United States v. Muegge, 225 F.3d 1267, 1270 (11th Cir. 2000) (per curiam)); see also United States v. Phillips, 812 F.2d 1355, 1360 (11th Cir.

---

[5] Carter argues that he was in custody for purposes of Miranda because a reasonable person in his situation would not have felt free to leave since his residence was "filled with armed agents, searching his home with a fine-tooth comb," see [Doc. 29 at 9], but the "Supreme Court [has] clarified 'that the freedom-of-movement test identifies only a necessary and not a sufficient condition for Miranda custody,'" United States v. Parker, Criminal Case No. 1:10-CR-0176-JEC-JFK, 2010 WL 5313758, at *8 (N.D. Ga. Nov. 18, 2010) (quoting Maryland v. Shatzer, 559 U.S. 98, 112 (2010)), adopted by 2010 WL 5313449, at *1 (N.D. Ga. Dec. 17, 2010). In other words, "'a free-to-leave inquiry reveals only whether the person in question was seized.'    While 'seizure is a necessary prerequisite to Miranda, . . . a court must [also] ask whether . . . a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest.'" United States v. Luna-Encinas, 603 F.3d 876, 881 (11th Cir. 2010) (alterations in original) (citations omitted).    Thus, "[t]he standards are different," and a person is in custody for Miranda purposes only where there is a "restraint on freedom of movement of the degree associated with a formal arrest."    United States v. Street, 472 F.3d 1298, 1310 (11th Cir. 2006) (citations and internal marks omitted); see also United States v. Cavazos, 668 F.3d 190, 193 (5th Cir. 2012) (citations omitted) ("Custody for Miranda purposes requires a greater restraint on freedom than seizure under the Fourth Amendment.").

1987) (per curiam) (citation omitted) (quoting <u>Minnesota v. Murphy</u>, 465 U.S. 420, 431 (1984)) ("'[T]he mere fact that an investigation has focused on a suspect does not trigger the need for *Miranda* warnings in noncustodial settings[.]'"). Instead, whether a suspect is in custody "depends on whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave." <u>Barry</u>, 479 F. App'x at 299 (quoting <u>Brown</u>, 441 F.3d at 1347). This test is objective, and "the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." <u>Brown</u>, 441 F.3d at 1347 (citation and internal marks omitted). Thus, "[t]he 'initial step' in determining whether a person was in 'custody' under *Miranda* 'is to ascertain whether, in light of the objective circumstances of the interrogation' and the totality of all the circumstances, 'a reasonable person would have felt that he . . . was not at liberty to terminate the interrogation and leave.'" <u>Matcovich</u>, 522 F. App'x at 851 (quoting <u>Howes v. Fields</u>, 565 U.S. 499, 509 (2012)). "[T]he reasonable person from whose perspective 'custody' is defined is a reasonable innocent person." <u>Street</u>, 472 F.3d at 1309 (internal marks omitted) (quoting <u>United States v. Moya</u>, 74 F.3d 1117, 1119 (11th Cir. 1996)).

The Court must "consider several factors in determining custody, 'including whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled.'" Barry, 479 F. App'x at 299 (quoting Street, 472 F.3d at 1309). Another relevant factor is the location of the questioning. In particular, "[a]lthough not dispositive, 'courts are *much less likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home.'" Matcovich, 522 F. App'x at 851 (quoting Brown, 441 F.3d at 1348)). Courts should also consider whether a suspect was "unambiguously advis[ed] . . . that he is free to leave and is not in custody." Id. (alterations in original) (citation and internal marks omitted). "This is a 'powerful factor' that 'generally will lead to the conclusion that the defendant is *not* in custody absent a finding of restraints that are so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview.'" Id. (citation omitted). Other factors include "the duration of the questioning, statements made during the interview, the presence of physical restraints during questioning, and 'the release of the interviewee at the end of the questioning[.]'" Id. (quoting Howes, 565 U.S. at 509).

Applying these factors to the instant case, the Court finds that Carter was not in custody for purposes of Miranda during the January 24, 2022, interview. After the agents cleared the residence while Carter and his wife waited outside, the agents escorted Carter and his wife back inside and had them sit in the living room while conducting the search. (Tr. at 13-15). The agents subsequently escorted Carter, who was not handcuffed, to his bedroom to conduct an interview in a private space. (Tr. at 26). Before interviewing Carter, Agent Norris advised him that he was not under arrest and could stop speaking with them at any time. See (Tr. at 15, 17-18). Carter sat in a chair facing the bedroom door, and he was not restrained in any way during the interview. (Tr. at 19, 26). The agents spoke in a calm tone of voice, no promises or threats were made, and the interview was brief, lasting only one hour. (Tr. at 12, 17-19; Gov. Ex. 2); see also United States v. McDowell, 250 F.3d 1354, 1363 (11th Cir. 2001) (finding suspect not in custody when questioned for four hours); Muegge, 225 F.3d at 1269, 1271 (finding suspect not in custody where interview lasted about two and a half hours). Although agents initially had their weapons drawn upon approaching the residence to conduct the safety sweep after Carter and his wife exited the residence and waited with Agent Norris and the Cobb County Deputy Sheriff, and Agent Norris frisked Carter for weapons when they arrived at the patrol car to wait until the safety

10

sweep was completed and may have touched Carter to assist him walking back to the residence, the agents' weapons were holstered throughout the interview and there is no evidence that Carter was threatened or physically touched during the interview or thereafter.    (Tr. at 12; Gov. Ex. 1 at 02:10-17:20); see also United States v. Blocker, CRIMINAL ACTION NO. 1:14-cr-228-AT/AJB, 2016 WL 3281018, at *17 (N.D. Ga. Feb. 29, 2016) (citations omitted), adopted by 2016 WL 3259096, at *2 (N.D. Ga. June 14, 2016).    Moreover, Agent Norris expressly advised Carter at the outset of the interview that he was not under arrest and could stop talking with them if he decided to do so.    (Gov. Ex. 2 at 02:50-03:02).    From the time the agents entered the residence until their departure, neither Carter nor his wife were placed under arrest or taken into custody, and ultimately, Carter was not arrested until after he was indicted several years later.    (Tr. at 10-11); [Doc. 3; Doc. 12].

Carter essentially argues that even though the interview took place in his own home, the residence was nonetheless a "police-dominated atmosphere" as his home had been "overrun by armed agents who direct[ed] his movement within his own walls," [Doc. 29 at 7-8 (citation and internal marks omitted)], but the fact remains that Carter "was interviewed in familiar surroundings," United States v. Rogers, Criminal Action No. 1:09–CR–544–TWT–ECS, 2010 WL 2721883, at *2 (N.D. Ga. June 9, 2010) (interview during execution of search warrant held not

11

custodial where defendant was questioned in his driveway and was prohibited from re-entering his home until the search was complete), adopted sub nom, United States v. Rodgers, Criminal File No. 1:09–CR–544–TWT, 2010 WL 2697084, at *1 (N.D. Ga. Jul. 7, 2010), which strongly militates against a finding that the interrogation was custodial, see Matcovich, 522 F. App'x at 851 (citation omitted).

Carter cites Orozco v. Texas, 394 U.S. 324, 326 (1969), for the proposition that "the Supreme Court itself has found an interrogation within a man's own bedroom — on his very own bed no less — to be custodial," [Doc. 29 at 7], but as the government correctly contends, [Doc. 30 at 8], Orozco is distinguishable because in that case, "[a]ccording to the officer's testimony, petitioner was under arrest and not free to leave when he was questioned in his bedroom in the early hours of the morning," Orozco, 394 U.S. 324 at 327; see also United States v. Burk, 737 F. App'x 963, 971 (11th Cir. 2018) (per curiam) (unpublished) (distinguishing Orozco under similar circumstances).6   In this case, the credible evidence shows that Carter was advised prior to the interview that he was not under arrest and did not have to answer questions, (Tr. at 17; Gov. Ex. 2 at 02:50-03:02), and "[t]his advice has been

---

6 None of the other cases cited by Carter are binding, see [Doc. 29 at 8], and in Burk, the Eleventh Circuit also distinguished one of the cases relied on by Carter as inapposite, 737 F. App'x at 971.

12

held to be a 'powerful factor' that 'generally will lead to the conclusion that the defendant [wa]s not in custody,'" Blocker, 2016 WL 3281018, at *17 (last alteration in original) (citation omitted).

The Court is not persuaded that the circumstances of Carter's interview–where Carter was seated comfortably in his bedroom in the familiar surroundings of his own home, free from physical restraints, and where the agents spoke to him in a cordial manner and with a calm tone of voice with their weapons holstered–"present[ed] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."    Peck, 17 F. Supp. 3d at 1359 (citation omitted). Nor does the mere fact that Carter was temporarily escorted out of the home and back inside where he remained seated with his wife in their living room during the execution of the search warrant suffice to convert the interview into a full-blown custodial interrogation.    Moreover, "[t]here certainly was no restraint on [Carter's] freedom of movement of a degree associated with formal arrest," Rogers, 2010 WL 2721883, at *2, which is required to establish custody under Miranda, see Brown, 441 F.3d at 1347 (citations omitted).

In sum, because Carter was not subject to custodial interrogation when the agents spoke with him at his home on January 24, 2022, Miranda warnings were not required.    Thus, the statements were not obtained in violation of Miranda,

and they are not due to be suppressed on that basis.    See Matcovich, 522 F. App'x at 852 (finding interview during execution of search warrant in defendant's residence was non-custodial where entry by law enforcement created a "'police-dominated atmosphere' with a number of officers handcuffing residents and bringing them to a central location," but where, "'shortly thereafter, the search warrant was announced, the handcuffs were removed,'" and the defendant was told that he was not under arrest).

**B.    *Voluntariness***

As previously noted, Carter also moved to suppress his statements on the basis that they were not voluntary, [Doc. 17 at 2], but he did not address this issue in his post-hearing brief, see [Doc. 29].    Although Carter's statements were not taken in violation of Miranda, "the [C]ourt still must determine that any confessions or incriminatory statements made by [ Carter] were voluntary in order to admit them at trial."    United States v. Lazarus, 552 F. App'x 892, 895 (11th Cir. 2014) (per curiam) (unpublished) (citing United States v. Bernal–Benitez, 594 F.3d 1303, 1317–18 (11th Cir. 2010)).    Thus, the Court will address the voluntariness of Carter's statements made on January 24, 2022.

Whether a statement was voluntarily given must be examined in light of the totality of the circumstances.    United States v. Shepherd, Criminal Case No. 1:11–

cr–00058–ODE–RGV–1, 2011 WL 4443440, at *7 (N.D. Ga. Aug. 23, 2011) (citing

Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); Hubbard v. Haley, 317 F.3d

1245, 1252 (11th Cir. 2003)), adopted by 2011 WL 4443435, at *1 (N.D. Ga. Sept. 21,

2011).   "This totality of the circumstances test directs the Court ultimately to

determine whether a defendant's statement was the product of 'an essentially free

and unconstrained choice.'"   United States v. Villaverde-Leyva, Criminal Action

File No. 1:10-CR-035-RWS/AJB, 2010 WL 5579825, at *11 (N.D. Ga. Dec. 9, 2010)

(citation omitted), adopted by 2011 WL 121932, at *1 (N.D. Ga. Jan. 14, 2011).

"Among the factors the Court must consider are the defendant's intelligence, the

length of his detention, the nature of the interrogation, the use of any physical

force against him, or the use of any promises or inducements by police."   Id.

(citations omitted).

The focus of the voluntariness inquiry is whether the defendant was coerced

by the government into making the statement, so "the relinquishment of the right

must have been voluntary in the sense that it was the product of a free and

deliberate choice rather than intimidation, coercion, or deception."   Moran v.

Burbine, 475 U.S. 412, 421 (1986); see also United States v. Cordova, 829 F. Supp.

2d 1342, 1353 (N.D. Ga. 2011) (citation omitted), adopted at 1345.   Thus, "[t]hose

cases where courts have found confessions to be involuntary 'have contained a

15

substantial element of coercive police conduct.'"   United States v. Patterson,

Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *4 (N.D. Ga. Aug. 10, 2007)

(quoting Colorado v. Connelly, 479 U.S. 157, 164 (1986)), adopted at *1.

"Sufficiently coercive conduct normally involves subjecting the accused to an

exhaustingly long interrogation, the application of physical force or the threat to

do so, or the making of a promise that induces a confession."   United States v.

Jones, 32 F.3d 1512, 1517 (11th Cir. 1994) (per curiam) (citation omitted); see also

Martin v. Wainwright, 770 F.2d 918, 926 (11th Cir. 1985) (alteration in original)

(citation and internal marks omitted) (noting that the test for determining

voluntariness of a confession and whether coercion was present is whether the

defendant's "will [was] overborne and his capacity for self-determination critically

impaired"), modified in unrelated part by, 781 F.2d 185 (11th Cir. 1986) (per

curiam).

"Considering the totality of the circumstances as established by the evidence

adduced at the evidentiary hearing, the Court finds that the government has

demonstrated by a preponderance of the evidence that [Carter's] statements were

entirely voluntary."   United States v. Lynn, 547 F. Supp. 2d 1307, 1311 (S.D. Ga.

2008) (citations omitted), adopted at 1308.   The evidence presented reveals that

Carter's statements were voluntarily made and not the product of any government

16

intimidation, coercion, or deception.   The audio recording of the interview indicates that the agents conducted the interview in a conversational manner, and the interview lasted no more than an hour, which was not unreasonably long.   See (Gov. Ex. 2); see also Shriner v. Wainwright, 715 F.2d 1452, 1455 (11th Cir. 1983) (concluding that statements made during a five-hour interrogation were not involuntary).   Additionally, the agents maintained a calm and cordial tone during the interview, did not brandish their weapons, and did not use any physical force against Carter or threaten him in any way, nor did they make any promises to him. See (Tr. at 12, 17; Gov. Ex. 2); see also Moran, 475 U.S. at 421 (citation omitted) ("[T]he record is devoid of any suggestion that police resorted to physical or psychological pressure to elicit the statements."); Miller v. Dugger, 838 F.2d 1530, 1537 (11th Cir. 1988) (finding that "there was no official overreaching that could have rendered [defendant's] statement involuntary" under the totality of the circumstances, including that "[t]he transcript [did] not suggest, nor d[id] [defendant] allege, that the police either applied physical force or threatened to do so").

Carter freely answered their questions after being told that he was not under arrest and could stop talking with them if he chose to do so.   See (Gov. Ex. 2). Carter appeared to understand the questions being asked of him and responded

17

appropriately in a lucid and coherent manner, and there is simply "no evidence in the record indicating that on the day the agents questioned [Carter], [he] was affected by any [physical or mental] disorders," and he "did not appear to be suffering from any [physical or] mental disorder, nor did his answers suggest that he was." United States v. Tolbert, Criminal Action File No. 1:14-cr-102-TCB, 2015 WL 3505147, at *11 (N.D. Ga. June 1, 2015), adopted at *1. Nothing in the record calls into question Carter's ability to have understood his situation and the agents' questions, as the recording of the interview and Agent Norris' testimony establish that Carter was lucid and provided coherent answers during the interview. Lazarus, 552 F. App'x at 896; see also United States v. Martin, 781 F.2d 671, 674 (9th Cir. 1985) (internal marks omitted) ("[A]lthough the defendant was injured and under medical care at the time the statements were made, the type, dosage, and schedule of painkilling narcotic administered to [defendant] was not sufficient to overbear his will to resist the questioning or impair his rational faculties."). Considering the totality of the circumstances, Carter's statements on January 24, 2022, were voluntary and are not due to be suppressed.

18

### III.   CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Carter's motion to suppress statements, [Doc. 17], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED AND RECOMMENDED**, this 13th day of July, 2026.


_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE